IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson June 3, 2008

**STATE OF TENNESSEE v. MICHAEL LEE JEFFCOAT**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-D-3313    Mark J. Fishburn, Judge**

_____

**No. M2007-02330-CCA-R3-CD - Filed November 6, 2008**

_____

The defendant, Michael Lee Jeffcoat, pled guilty to three counts of delivery of twenty-six grams or more of cocaine, a Class B felony.  The trial court sentenced the defendant as a Range II, multiple offender to eighteen years in the Department of Correction on each count, with the sentences to be served concurrently.  On appeal, the defendant argues that the trial court erred by denying him alternative sentencing, and he also argues that the eighteen-year sentences imposed by the trial court were excessive.  After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Glenn R. Funk, Nashville, Tennessee, for the appellant, Michael Lee Jeffcoat.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The record reflects that in December 2006, the Davidson County Grand Jury indicted the defendant on three counts of delivery of twenty-six grams or more of a substance containing cocaine. The indictment alleged that the offenses took place on March 14, 16, and 28, 2006.  On May 17, 2007, the defendant pled guilty to all three counts of the indictment.  Pursuant to the agreement, the defendant agreed to be sentenced as a Range II, multiple offender with the length and manner of service to be determined by the trial court.  The defendant's sentencing hearing was held on July 18 and October 3, 2007.

Sergeant James McWright with the Twentieth Judicial District Drug Task Force testified that he had investigated the defendant in 1999 for selling MDMA (ecstasy). This investigation led to the defendant's arrest on federal charges of possession of a Schedule I controlled substance with intent to distribute. The defendant pled guilty to these charges and in December 1999 he was sentenced to forty-four months in federal prison.

In May 2003, after the defendant's July 2001 release from federal prison, Sergeant McWright's office again investigated the defendant, this time for selling cocaine. After a confidential informant made two separate purchases of cocaine (one purchase involved a quarter-kilogram, the other a half-kilogram), the defendant was arrested. The defendant then agreed to assist the police in their investigation of the defendant's distributor. After the distributor was arrested, the defendant pled guilty to one count of sale of less than a half-gram of cocaine and was sentenced to three years' probation. Sergeant McWright testified that during this investigation, he saw no signs that the defendant was mentally ill. Rather, the defendant was "working out at the gym and running a business and selling drugs on the side. . . . [H]e never indicated to me that he . . . had a mental problem of any type." Sergeant McWright testified that the current case developed after Detective Herb Kajihara of the Metropolitan Nashville Police Department and the Twentieth Judicial District Drug Task Force was notified by a confidential informant that he could purchase a large quantity of cocaine from the defendant.

Detective Kajihara testified that he was the Task Force's lead investigator in this case. He said that on March 14, 2006, a confidential informant purchased one ounce, or approximately twenty-nine grams,[1] of cocaine from the defendant at his residence. The informant paid $750 for the cocaine. Detective Kajihara said that the informant and the defendant arranged for another purchase of cocaine on March 16, 2006. As part of this transaction, the informant agreed to pay $1500 for two ounces, or approximately fifty-eight grams, of cocaine. The defendant was working as a bouncer at a Nashville bar at the time, so the defendant told the informant to leave the money in the defendant's car, which was parked outside the bar, and take the drugs, which would be inside the car. Detective Kajihara testified that on the night of the transaction, the defendant told the informant that the amount of drugs in the defendant's car was five grams short of two ounces. However, the informant still took the drugs and left the $1500 in the defendant's car.

Detective Kajihara testified that the confidential informant and the defendant arranged for another sale of two ounces of cocaine on March 28, 2006. Before the transaction, the informant called the defendant and told him that the previous amount of cocaine he had purchased was fifty-three grams, or roughly five grams short of two ounces; therefore, the defendant and the informant agreed that the informant would pay the defendant $1500 and the defendant would give the defendant five additional grams of cocaine in this transaction to make up for the previous deficiency. Detective Kajihara testified that the amount of cocaine delivered to the informant in the March 28

---

[1]Detective Kajihara testified that two ounces of cocaine equaled fifty-eight grams. According to common metric conversions, one ounce equals 28.3495 grams.

transaction was in fact sixty-three grams.

Detective Kajihara testified that the informant attempted to make additional purchases from the defendant but was unable to contact him. The Task Force was unable to locate the defendant until December 30, 2006, when he was arrested. After the defendant's arrest, he told police that he never sold more than an "eight-ball" at a time and never purchased more than twenty-eight grams of cocaine at a time. The detective testified that this statement was inconsistent with the latter two purchases which the confidential informant had made from the defendant, which were fifty-three and sixty-three grams. On cross-examination, Detective Kajihara said that he never drug-tested the informant and did not know whether the informant and the defendant used cocaine together. He also said that when the defendant was arrested, the police located a "one-hitter," a device used to snort cocaine, in the defendant's car. The detective said that the device, which the defendant admitted was his, had cocaine residue on it at the time of the defendant's arrest.

Tamara Allen, testifying for the defendant, said that she was employed by the Mental Health Cooperative as the Criminal Justice and Mental Health Liaison for Davidson County. She testified that as part of her duties, which involved obtaining services for the agency's clients, she interviewed the defendant to assess his suitability for the agency's services. Allen said that the defendant had a diagnosis of posttraumatic stress disorder (PTSD) and polysubstance abuse, which meant that the defendant was "depend[e]nt on more than three substances." Allen said that based on her interviews with the defendant and employees at the jail where the defendant was housed, she learned that the defendant was having "no problems with his activities of daily living" and was "getting along with the folks in jail." She specifically noted that the jail's disciplinary officer "had never heard of [the defendant], which I inferred that meant he wasn't a disciplinary problem if the disciplinary officers hadn't heard of him." Allen said that the defendant did not qualify for services through her agency; rather, she recommended that the defendant "seek therapy to address his past issues and attend an intensive outpatient program to address his alcohol and drug addictions."

On cross-examination, Allen said that the defendant was not receiving medication for mental illness while in jail. She also said that her conclusion that the defendant suffered from PTSD was based solely on her interview with the defendant. Allen said that the defendant told her the last time he used drugs of any kind was December 29, 2006, the date of his arrest. She also testified that the defendant's employment as a bouncer at a bar was inconsistent with someone suffering from posttraumatic stress; she noted that the defendant had told her that he tended to avoid crowded places, such as shopping malls. On redirect examination, Allen said that the effects of PTSD could be controlled through medication or though the use of alcohol and illicit drugs.

The defendant testified that he had previously met the confidential informant in this case but renewed acquaintance with him in late 2005. The defendant said that ultimately, he and the informant "got high" together on two or three occasions. The defendant said that the informant asked him if he would sell the informant some drugs, and the defendant said that he did sell the informant cocaine on three occasions: March 14, 16, and 28, 2006. The defendant said that the informant was the only person to whom he sold drugs during that time; the defendant testified that

at that time, he "was just mainly using" drugs. The defendant said he used up to a quarter-ounce of cocaine three or four days per week. The defendant said he held a series of jobs during that time, and that he used any money he made from those jobs to purchase drugs.

The defendant said that after the date of the last sale, the confidential informant continued to call him to set up more drug purchases. However, the defendant said that he only wanted to use drugs, not sell them, so he changed his telephone number. He also said that he did not attempt to contact the informant after the last sale.

The defendant said that he successfully completed a forty-eight-day drug treatment program while in jail following his December 2006 arrest. He completed various computer skills and life skills classes and was baptized while in jail. He testified that he was presently enrolled in a jail program called Jericho, which he described as a Christian-based program that had several components, including life skills training, substance abuse treatment, and Bible study. He said the program met five days a week for six hours each day.

The defendant testified that he had been diagnosed by a physician at Vanderbilt University Medical Center as having posttraumatic stress disorder. He said that he had been prescribed medication to treat the disorder, but he did not want to take the medication, so he self-medicated. The defendant said that he was able to control his PTSD symptoms while serving as a bouncer by taking several drugs, including cocaine, ecstasy, and alcohol. The defendant said that the PTSD symptoms resulted from his being shot in the chest at his mother's house when he was seventeen years old. The defendant said that he was not selling drugs at the time of the shooting. He testified that a man wearing a ski mask shot him "[i]n the chest, [at] point-blank range" before leaving the house. The defendant said that as a result of the shooting, he had pins in his chest and a "fake collarbone," and he also said that the bullet from the shooting was still lodged in his shoulder.

The defendant said that if given community corrections, drug court, or some other form of alternative sentencing, he would be willing to abide by any conditions of his release, including mental health counseling and treatment for his drug addictions. He also said that he would be willing to stay employed during his release.

On cross-examination, the defendant admitted that in 1999, while being investigated by the Drug Enforcement Agency (DEA) and Tennessee Bureau of Investigation (TBI), he made three sales of one thousand ecstasy pills. The defendant denied making the sales to confidential informants or agents; rather, he said he made the sales to Jerome Boyd, whom he described as "[a] guy that got in trouble that day." He also admitted that the police found $19,000 in his apartment and $23,714 in his mother's attic, and that the cash represented the proceeds form the defendant's drug sales. The defendant said that in 2003, less than two years after being released from federal prison, he sold a quarter-kilogram (approximately 8.82 ounces) and then a half-kilogram (approximately 17.64 ounces) of cocaine to a confidential informant. After his arrest, the defendant assisted police in the investigation of his cocaine supplier, who was ultimately arrested.

While the defendant was being cross-examined during the first day of the sentencing hearing, the prosecuting attorney noted that the defendant appeared "fidgety and distracted." The defendant said that he had "severe anxiety" and had been awake since 4:00 that morning, nearly twelve hours before his testimony began. The defendant said that he was "struggling" and that his mind was "fogged." Thus, after slightly less than ten minutes of cross-examination, the trial court ordered the sentencing hearing continued to October 3, 2007.

When the sentencing hearing resumed, the defendant said that he was released from federal prison in July 2001 and placed on probation. However, after the defendant pled guilty to the 2003 state charges, he returned to federal prison to complete his sentence. After his release from prison in 2005, he began serving his three-year probation sentence on the state conviction. The defendant admitted that he was on probation when he was arrested in the present case. He also admitted that in June 1995, he pled guilty to misdemeanor possession of a firearm and to using false identification at the time of booking. The defendant said that the weapons possession charge resulted from his use of a gun to break up a fight in which his friend was involved outside a night club. He also admitted to a 1993 conviction for driving on a suspended license and a 1994 conviction for assault.

Dr. Keith Caruso testified that he conducted a psychiatric evaluation on the defendant shortly before the date on which the sentencing hearing resumed. As part of his evaluation, Dr. Caruso interviewed the defendant and reviewed his medical records and various police reports and discovery materials associated with his case. Dr. Caruso said that in addition to PTSD, with which the defendant had been diagnosed in 2002, the defendant suffered from bipolar disorder and panic disorder, and he also was dependent on several drugs, including amphetamines, alcohol, and cocaine. Dr. Caruso said that when the defendant was first diagnosed with PTSD, he was given Zoloft and Paxil. However, the defendant experienced some side effects from the drugs, and therefore he stopped taking the medication.

When asked about the defendant's treatment options, Dr. Caruso said that the defendant "ought to have psychiatric treatment," including mood-stabilizing medication to treat his bipolar disorder and antidepressant medication to treat his PTSD and panic disorder. Dr. Caruso also said that the defendant should receive substance abuse treatment. Dr. Caruso said that the defendant's actions on the first day of the sentencing hearing were consistent with someone who could be having a panic attack, although Dr. Caruso could not say with any certainty whether the defendant suffered a panic attack that day because he was not present in court.

Three men testified that they would be willing to employ the defendant were he to be released into the community and avoid using drugs once released. Brad Rickman, vice president of a home construction company, testified that were the defendant to work for him, the defendant would work at least forty hours per week. Bruce Dady, the owner of an electrical company, testified that he had known the defendant for approximately fifteen years and had previously employed the defendant during a three-month period in early 2006. Dady said that the defendant had initially done well in his work as an electrician, but once Dady became aware of the defendant's drug use, he fired the defendant in late winter or early spring 2006. Dady testified that were the defendant to work for him,

he would be working at least sixty hours per week. Lawson Warren, another of the defendant's friends, testified that he would be willing to employ the defendant at Warren's new business in Montana. Warren said that the job would "involve[] a component of weight-lifting and weight-training, diets and exercise" and would represent "a fresh start in a fresh location."

Robert Cassman with the Davidson County Drug Court testified that after his first interview with the defendant in May 2007, he recommended the defendant for outpatient services through the drug court. However, Cassman testified that in light of the defendant's additional diagnoses and the level of treatment he needed, including medication to control his various mental disorders, the defendant was no longer a suitable drug court candidate.

At the conclusion of the sentencing hearing, the trial court denied the defendant's request for alternative sentencing and sentenced him to three concurrent eighteen-year sentences in the Department of Correction. The defendant filed a timely notice of appeal on October 10, 2007.

ANALYSIS

On appeal, the defendant argues that the trial court erred by denying him alternative sentencing and by imposing an excessive sentence of eighteen years. We disagree.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

*Alternative Sentencing*

In determining whether incarceration or an alternative sentence is more appropriate, a trial court should consider whether (1) confinement is needed to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is needed to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to

people likely to commit similar offenses, or (3) less restrictive measures than confinement have frequently or recently been applied unsuccessfully to the defendant. Ashby, 823 S.W.2d at 169 (citing Tenn. Code Ann. § 40-35-103(1)(A)-(C)). The trial court shall also consider the mitigating and enhancing factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. Tenn. Code Ann. § 40-35-210(b)(5) (2006); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). In addition, a trial court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code. Ann. § 40-35-103(5); Boston, 938 S.W.2d at 438. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

On appeal the defendant argues, as he did at the sentencing hearing, that the trial court should have granted him a community corrections sentence based on his mental health concerns and his attempts to abandon his criminal behavior—a change in behavior which the defendant argues he began after making the final sale to the confidential informant in this case. Indeed, the defendant was eligible to be placed on community corrections. See Tenn. Code Ann. §§ 40-36-103(1), -106(a). However, as the defendant was convicted of a Class B felony and sentenced as a Range II offender, the statutory provision under which a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony . . . should be considered as a favorable candidate for alternative sentencing options" did not apply. See Tenn. Code Ann. § 40-35-102(6). In denying the defendant a community corrections sentence, the trial court noted that the defendant had two prior convictions for drug-related offenses, one in state court and one in federal court. The trial court also noted that "measures less restrictive than confinement" had twice been applied to the defendant, as he was granted early release from his federal sentence and was given probation in connection with his state drug conviction, but these measures were unsuccessful, as both times he committed additional drug-related offenses. The trial court also noted that the defendant had taken no prolonged steps to address his purported mental health issues and had a "sporadic" employment history. The trial court found that these facts indicated that the defendant's potential for rehabilitation was low and therefore confinement was necessary to protect society from the defendant and to avoid depreciating the seriousness of the defendant's offenses. We agree with the trial court's reasoning and affirm the trial court's denial of alternative sentencing in this case.

*Length of Sentence*

The defendant committed his offenses in March 2006; thus, he was sentenced under the revised sentencing act as enacted by the Tennessee General Assembly in 2005. The act provides:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2) (2006).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In imposing a sentence, the trial court may only consider enhancement factors that are "appropriate for the offense" and "not already . . . essential element[s] of the offense." Tenn. Code Ann. § 40-35-114 (2006). These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "[f]acts which establish the elements of the offense charged." State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994). Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the legislature took into consideration when establishing the range of punishment for the offense." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997); Jones, 883 S.W.2d at 601.

The trial court applied two enhancement factors to the defendant's sentence: "The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and "The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(1), (8). The trial court stated that it considered the statutory mitigating factors and found that none applied. The trial court sentenced the defendant to eighteen years in the Department of Correction on each offense, which was within the twelve-to-twenty-year range established for a defendant convicted of a Class B felony as a Range II, multiple offender. See id. § 40-35-112(b)(2).

In this case, the enhancement factors relied upon by the trial court were supported by the record. The record reflects, and the defendant admitted at the sentencing hearing, that he was on probation for his 2003 state cocaine possession conviction when he committed the instant offenses. Furthermore, in addition to the state and federal convictions which qualified the defendant to be

sentenced as a Range II offender, the record reflects that the defendant had four prior misdemeanor convictions for weapons possession, using false identification, assault, and driving on a suspended license. The trial court's weighing these enhancement factors, refusing to apply mitigating factors, and imposing a sentence within the range of punishment were within the trial court's discretion. Accordingly, we affirm the concurrent eighteen-year sentences imposed by the trial court.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE